# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CHARLES ROBERT SMITH,

      Plaintiff,

v.

FEDERAL BUREAU OF INVESTIGATION,

      Defendant.

Civil No. 25-12-BAH

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Charles Robert Smith ("Smith") brought suit against Defendant Federal Bureau of Investigation (the "FBI") seeking injunctive and declaratory relief to compel the FBI, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 et seq., to provide information for use in Smith's defense related to the FBI's ongoing investigation into Mario Mireles Ruiz ("Ruiz"), whom Smith is charged with murdering. *See* ECF 1. Pending before the Court are the FBI's motion for summary judgment, ECF 33, and Smith's cross-motion for summary judgment, which also serves as Smith's opposition to the FBI's motion, ECF 37. The FBI filed an opposition to Smith's cross-motion for summary judgment. ECF 38. Also pending before the Court is Smith's motion to supplement the administrative record, ECF 31, to which the FBI filed an opposition, ECF 36.[1] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, Smith's motion to

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

supplement is **DENIED**, the FBI's motion for summary judgment is **GRANTED**, and Smith's cross-motion for summary judgment is **DENIED**.

## I.    BACKGROUND

The Court repeats the facts from its prior memorandum opinion in a related case, *Maryland v. Smith*, 766 F. Supp. 3d 498, 502–05 (D. Md. 2025). On June 11, 2023, Ruiz, Christian Segovia, and Nicoles Mireles were killed in a mass shooting in Annapolis, Maryland. Three others—Rosalina Segovia, Paul Melvin Johnson, III, and Enner Canales Hernandez—were injured. Smith is charged with murder, assault, and other charges related to the shooting.

After the shooting occurred, the Annapolis Police Department requested that the FBI assist with processing the crime scene, which included the deployment of the FBI Laboratory Shooting Reconstruction Team. The FBI documented its investigative efforts in FBI Case File #343G-BA-3773068 (the "343G Assist File"). Separately, at the time of, and unrelated to the mass shooting, the FBI and the United States Attorney's Office for the District of Maryland ("USAO-MD") were investigating Ruiz for potential involvement in drug distribution. That investigation, which remains ongoing at the time of this litigation, is documented in FBI Case File #281C-BA-3708548 (the "281C Investigation File").

As a result of the shooting, Smith was charged with 42 crimes, including three counts of first-degree murder, six counts of attempted first-degree murder, and three counts of first-degree murder substantially motivated by animus towards persons of Hispanic national origin. The Anne Arundel County State's Attorney's Office's ("AAC-SAO's") prosecution of Smith is ongoing. Smith is represented by the Maryland Office of the Public Defender ("MPD"). Smith admits to perpetrating the shooting, and Smith's defense counsel has represented that they intend to defend Smith by contending that Smith carried out the shooting in defense of himself and his mother.

2

For reasons still apparently unclear to the FBI, the separate investigation into Ruiz became public, prompting the AAC-SAO and MPD to serve discovery requests on the FBI. Beginning in January 2024, a series of requests were filed in the underlying state court criminal case. Such requests are commonly referred to as "*Touhy* requests," on which a bit of background is useful for understanding this case.

Under 5 U.S.C. § 301, "commonly known as the 'Housekeeping Statute,' federal agencies are granted authority to prescribe regulations governing the agency, including regulations for 'the custody, use, and preservation of its records, papers, and property.'" *United States v. Williams*, 170 F.3d 431, 433 (4th Cir. 1999) (quoting 5 U.S.C. § 301). In *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 466–68 (1951) ("*Touhy*"), the Supreme Court recognized the validity of a Department of Justice ("DOJ") order that restricted the disclosure of information pursuant to the Housekeeping Statute. In so holding, the Supreme Court observed that "[w]hen one considers the variety of information contained in the files of any government department and the possibilities of harm from unrestricted disclosure in court, the usefulness, indeed the necessity, of centralizing determination as to whether subpoenas duces tecum will be willingly obeyed or challenged is obvious." *Id.* at 468. The term "*Touhy* regulations" thus "refer[s] to the processes for requesting official information from U.S. government agencies in court proceedings" pursuant to rules promulgated by federal agencies governing disclosure of such information. *Iovino v. Michael Stapleton Assocs., Ltd.*, No. 5:21-CV-00064, 2024 WL 3520170, at *1 (W.D. Va. July 24, 2024), *appeal dismissed*, No. 24-1735, 2025 WL 2269780 (4th Cir. Apr. 16, 2025). "*Touhy* requests" refer to the discovery requests made under those regulations.[2] *See id.*

---

[2] The DOJ's *Touhy* regulations, applicable here, are found at 28 C.F.R. §§ 16.21–29. *See Smith*, 766 F. Supp. 3d at 501 n.1; *see also Gulluni v. Levy*, 85 F.4th 76, 82 (1st Cir. 2023) (citing 28 C.F.R. §§ 16.21–29).

3

On January 26, 2024, the AAC-SAO sent the FBI a *Touhy* request seeking the production of portions of the 281C Investigation File and the testimony of an FBI Agent or other federal officer to fulfill the State's disclosure requirements under *Brady v. Maryland*, 373 U.S. 83 (1963). On February 12, 2024, the USAO-MD sent a limited *Touhy* authorization letter in response to the first AAC-SAO *Touhy* request. Specifically, the USAO-MD authorized the disclosure of four written reports from the 281C Investigation File that were "redacted as needed to protect the integrity of the Investigation." The USAO-MD did not, however, authorize "(1) the production of materials, documents, or information relating to or documenting criminal conduct that occurred after Mr. Ruiz's death, or (2) the testimony of current or former FBI agents in the State's case." Additionally, the USAO-MD did not authorize the release of, *inter alia*, any documents or information "that may compromise any ongoing federal criminal investigation," the "identity of or information indicating the identity of confidential sources or information," or any "documents regarding investigative techniques, target names, informant names, witnesses, defendants, criminal case numbers, or matters that occurred before a federal grand jury."

On June 7, 2024, the MPD sent the FBI a *Touhy* demand of its own seeking the production of documents, and related trial testimony of two FBI agents, regarding any known gang affiliations of the Mireles family and associates, and their alleged intent to finance violence against, and possibly the murder of, Smith. On July 11, 2024, the USAO-MD sent a limited *Touhy* authorization letter in response to the MPD's request. The FBI produced documents, subject to the terms and conditions in the authorization letter, from the 343G Assist File. However, the production of materials, documents, or information from the 281C Investigation File, as well as the requested trial testimony of FBI agents, was not authorized for the same reasons articulated in the USAO-MD's response to the first AAC-SAO *Touhy* request.

On December 20, 2024, the FBI removed Smith's criminal case from the Circuit Court for Anne Arundel County to this Court for the purpose of quashing certain subpoenas and orders from the circuit court arising from those *Touhy* requests. *See State of Maryland v. Charles Smith*, Civ. No. 24-3699-BAH (D. Md.), ECF 1. In that case, the Court held that sovereign immunity barred the Anne Arundel County Circuit Court and this Court from compelling the FBI to produce documents or requiring FBI agents to testify, and the Court observed that the proper channel through which Smith could challenge the FBI's decision, and the only mechanism for judicial review of a final agency action, was under the APA. *See Smith*, 766 F. Supp. 3d at 509.

On January 2, 2025, Smith filed this action, seeking judicial review of the FBI's response to his *Touhy* request pursuant to the APA. *See* ECF 1. In Count One, Smith alleges that the FBI has "unlawfully withheld and unreasonably delayed the disclosure of information regarding the criminal ties of . . . Ruiz and other members of the Mireles family" and seeks an injunction to compel the FBI to disclose such information. ECF 1, at 10–11. In Count Two, Smith seeks essentially identical declaratory relief under the APA. *See id.* at 11–12. On July 1, 2025, the FBI filed the administrative record with the Court, ECF 28, and on July 15, 2025, the FBI filed a motion for summary judgment, ECF 33. On July 13, 2025, Smith moved to supplement the administrative record, ECF 31, and on August 6, 2025, Smith filed a cross-motion for summary judgment, ECF 37. These motions are now ripe for resolution.

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In a case involving review of a final agency action under the APA, however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record." *Nat'l Fed'n of the*

*Blind v. U.S. Abilityone Comm'n*, 421 F. Supp. 3d 102, 114 (D. Md. 2019) (citing *Otsuka Pharm. Co., Ltd. v. Burwell*, Civ. No. GJH-15-852, 2015 WL 3442013, at *5 (D. Md. May 27, 2015)). Summary judgment thus serves merely as the "mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Id.* "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* (alteration in *Nat'l Fed'n of the Blind*) (quoting *Air Transp. Ass'n of Am. v. U.S. Dep't of Agric.*, 303 F. Supp. 3d 28, 38 (D.D.C. 2018)).

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). However, the agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Agency action is generally considered arbitrary or capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

"[T]he Fourth Circuit [has] held that courts should review [an agency's] refusal to comply with a third-party subpoena under the arbitrary and capricious standard set forth in the" APA. *In re Subpoena to Nat'l Sci. Found., Off. of Inspector Gen.*, No. 3:18-MC-00006-JAG, 2018 WL

6

5017612, at *2 (E.D. Va. Oct. 16, 2018) (citing *COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d

269, 274 (4th Cir. 1999)). As the Fourth Circuit observed, an agency's refusal "is essentially a

policy decision about the best use of the agency's resources." *COMSAT Corp.*, 190 F.3d at 278.

"Reviewing courts, therefore, must 'defer to the agency's judgment, recognizing . . . that federal

judges—who have no constituency—have a duty to respect legitimate policy choices made by

those who do.'" *In re Subpoena to Nat'l Sci. Found.*, 2018 WL 5017612, at *2 (quoting *COMSAT*

*Corp.*, 190 F.3d at 278).

## III.    ANALYSIS

### A.    Motion to Supplement the Administrative Record

Smith moves to supplement the administrative record, ECF 31, which the FBI opposes,

ECF 36. As a general matter, the Court must "review an agency's decision 'solely by the grounds

invoked by the agency.'" *Jimenez-Rodriguez v. Garland*, 996 F.3d 190, 194 (4th Cir. 2021) (citing

*SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943)). Accordingly, "claims brought under the APA

are adjudicated without a trial or discovery, on the basis of an existing administrative record."

*Audubon Naturalist Soc'y of The Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d

642, 660 (D. Md. 2007); *see also Hampton Univ. v. Accreditation Council for Pharmacy Educ.*,

No. 4:20CV118 (RCY), 2021 WL 3166380, at *12 (E.D. Va. July 27, 2021) ("Judicial review of

an accrediting agency's decision is generally confined to the administrative record." (citing

*Professional Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. & Colls.*, 781 F.3d

161, 174–75 (4th Cir. 2015))). The administrative record "is 'the full administrative record that

was before' the agency decision maker at the time of the decision." *Id.* (quoting *Citizens to Pres.*

*Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).

"If an agency fails to produce a complete administrative record, a party may request that

the record be supplemented." *Hilaire v. United States*, Civ. No. GJH-22-923, 2023 WL 284448,

7

at *4 (D. Md. Jan. 18, 2023), *appeal dismissed,* No. 23-1185, 2023 WL 5346068 (4th Cir. May 2,

2023). However, "[s]upplementation of the administrative record is the exception, not the rule."

*Otsuka Pharm. Co. v. Burwell,* Civ. No. GJH-15-852, 2015 WL 1579127, at *2 (D. Md. Apr. 8,

2015) (alteration in *Burwell*) (quoting *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army

Corps of Eng'rs,* 448 F. Supp. 2d 1, 5 (D.D.C. 2006)). "[A]bsent clear evidence to the contrary,

an agency is entitled to a strong presumption of regularity, that it properly designated the

administrative record." *Bimini Superfast Operations LLC v. Winkowski,* 994 F. Supp. 2d 103, 105

(D.D.C. 2014) (quoting *Pac. Shores,* 448 F. Supp. 2d at 5). Nevertheless, "an 'agency may not

skew the record by excluding unfavorable information but must produce the full record that was

before the agency at the time the decision was made.'" *Burwell,* 2015 WL 1579127, at *2 (quoting

*Blue Ocean Inst. v. Gutierrez,* 503 F. Supp. 2d 366, 369 (D.D.C. 2007)). "Nor may an agency

exclude information simply because it did not rely on it for its final decision." *Id.* (citing *Banner

Health v. Sebelius,* 945 F. Supp. 2d 1, 16 (D.D.C.2013)). "This means an agency must include all

documents and materials 'directly or indirectly' considered by the agency." *S.C. Coastal

Conservation League v. Ross,* 431 F. Supp. 3d 719, 722 (D.S.C. 2020) (first citing *Bar MK Ranches

v. Yuetter,* 994 F.2d 735, 739 (10th Cir. 1993); and then citing *Thompson v. U.S. Dep't of Labor,*

885 F.2d 551, 555 (9th Cir. 1989)).

"To overcome the presumption that the agency properly designated the record, 'a plaintiff

must (1) identify reasonable, non-speculative grounds for the belief that the documents were

considered by the agency and not included in the record, and (2) identify the materials allegedly

omitted from the record with sufficient specificity, as opposed to merely proffering broad

categories of documents and data that are likely to exist as a result of other documents that are

included in the administrative record[.]'" *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of*

*Homeland Sec.*, Civ. No. ELH-16-1015, 2017 WL 3189446, at *13 (D. Md. July 27, 2017) (alteration in *Outdoor Amusement*) (internal quotation marks omitted) (quoting *Ctr. for Food Safety v. Vilsack*, No. 15CV01590HSGKAW, 2017 WL 1709318, at *13 (N.D. Cal. May 3, 2017)).

An administrative record can be supplemented "in one of two ways—either by (1) including evidence that should have been properly a part of the administrative record but was excluded by the agency, or (2) adding extrajudicial evidence that was not initially before the agency but the party believes should nonetheless be included in the administrative record." *Burwell*, 2015 WL 1579127, at *3 (quoting *WildEarth Guardians v. Salazar*, 670 F. Supp. 2d 1, 5 n.4 (D.D.C. 2009)). Here, Smith seeks supplementation of the record in primarily the former respect. *See* ECF 31, at 2. Smith argues that several heavily redacted documents should be included as unredacted in the record. *See id.* (seeking to include "[u]nredacted copies of all documents submitted by Defendant on or about July 1, 2025," "[u]nredacted copies of the February 12, 2024 Memorandum re: *Touhy* Request, referenced in the Defendant's privilege log," and "[u]nredacted copies of the July 10, 2024 Memorandum re: *Touhy* Request referenced in the Defendant's privilege log"). Smith also seeks to include a "privilege log or *Vaughn* index" and "[a]ll emails and communications generated by the Defendant but not included in the July 1, 2025 Administrative Record, including but not limited to those sent within the agency and those sent externally to the Office of the States Attorney for Anne Arundel County and local law enforcement." *Id.*

### 1.    Privileged Information

The FBI indicates that there are two types of redacted material in the administrative record before the Court—first, redactions applied to information unauthorized for disclosure, and second, other redactions that are purportedly "PI," or personal information redacted in accordance with Federal Rule of Civil Procedure 5.2. *See* ECF 36, at 4–5; *e.g.*, ECF 28-1, at 5. Under that rule,

parties must generally redact portions of "an individual's social-security number, taxpayer-identification number, or birth date, the name of an individual known to be a minor, or a financial-account number." Fed. R. Civ. P. 5.2(a). There appears to be no dispute between the parties that this category of redactions could be properly applied. *See* ECF 36, at 5; ECF 32, at 6. Nevertheless, Smith takes issue with (1) the redacted copies of "all documents" in the administrative record, (2) redacted copies of "the February 12, 2024 Memorandum re: *Touhy* Request" and (3) "the July 10, 2024 Memorandum re: *Touhy* Request referenced in the Defendant's privilege log." ECF 32, at 6.

First, Smith's general request for the unredacted copies of all documents in the administrative record in overbroad and thus insufficient. Smith's request to supplement the record must "identify the materials allegedly omitted from the record with *sufficient specificity,* as opposed to merely proffering broad categories of documents and data." *Outdoor Amusement*, 2017 WL 3189446, at *13 (emphasis added) (citation omitted). Requesting that this Court order "[a]n unredacted copy of the administrative record" is contrary to that directive. *See* ECF 32-1, at 1. Moreover, the FBI observes that the non-PI redactions in the administrative record "appear on four FBI reports provided . . . on or about March 4, 2024, in response to the [AAC]-SAO's *Touhy* request to the FBI." ECF 36, at 5; *see also* ECF 28-1, at 12–23 (redacted materials). However, as the FBI observes, these reports were not redacted as part of the compilation of the administrative record, but rather as a result of the FBI's decision not to authorize their disclosure in response to the *Touhy* requests. *See* ECF 36, at 5. Smith cannot gain access to the very information this lawsuit seeks to compel through the procedural backdoor of supplementation.

As to Smith's more specific requests for unredacted copies of the memoranda referenced in the privilege log the FBI provided to Smith, those materials are not appropriately included in an

administrative record. "A complete administrative record . . . does not include privileged materials, such as documents that fall within the deliberative process privilege, attorney-client privilege, and work product privilege." *Tafas v. Dudas*, 530 F. Supp. 2d 786, 794 (E.D. Va. 2008) (citing *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1457–58 (1st Cir. 1992)). Indeed, "the D.C. Circuit long ago held that 'internal memoranda made during the decisional process . . . are never included in a record.'" *Id.* (quoting *Norris & Hirshberg v. SEC*, 163 F.2d 689, 693 (D.C. Cir. 1947)) (collecting cases). "Deliberative materials are excluded from the administrative record for two reasons." *Id.* First, judicial review of agency action should be based on the agency's stated justification—the pre-decisional process and subjective motivations of agency decisionmakers are irrelevant as a matter of law. *See id.* Second, "excluding deliberative materials 'prevent[s] injury to the quality of agency decisions' by encouraging uninhibited and frank discussion of legal and policy matters." *Id.* (alteration in *Tafas*) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–52 (1975)).

Smith argues that the FBI bears the burden of proving that the document is privileged, and he contends that "the mere self serving act of titling a document memorandum does not properly invoke the privilege." ECF 32, at 3–5. In support of those propositions, Smith invokes *Ethyl Corp. v. United States Environmental Protection Agency*, 25 F.3d 1241 (4th Cir. 1994). There, the Fourth Circuit considered a plaintiff's challenge brought under the Freedom of Information Act to compel the production of records from the EPA relevant to the EPA's denial of a waiver for approval of a gasoline additive. *Id.* at 1243. The district court had concluded that the EPA's efforts in searching information were adequate, there was no dispute of material fact, and that no in camera inspection of records was necessary to resolve the case. *See id.* The Fourth Circuit reversed because it

11

concluded that "factual questions remained on issues on which the EPA had the burden of proof." *Id.*

In so holding, the Fourth Circuit explained that "review of the agency's decision to withhold a document" in the context of a FOIA determination "does not automatically require an *in camera* inspection." *Id.* at 1249 (citing *EPA v. Mink*, 410 U.S. 73, 93 (1973)). Rather, the D.C. Circuit in *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), created "a mechanism to take advantage of the flexibility allowed by" avoiding *in camera* review while also balancing the "one-sided nature of[] a FOIA production." *Ethyl Corp.*, 25 F.3d at 1249. "The court in *Vaughn* thus directed that the government provide a detailed justification for its exemption and index the documents against the justification, fragmenting the documents into segregable parts"—what has come to be known as a *Vaughn* index. *Id.* at 1250. Further, the Fourth Circuit observed that the FOIA statute "requires partial disclosure of records 'reflecting deliberative or policy making processes on the one hand, and purely factual, investigative matters on the other.'" *Id.* (quoting *Mink*, 410 U.S. at 89). "And the EPA, in [that] case, ha[d] the burden of showing that no segregable information exists." *Id.* (citing *Army Times Publishing Co. v. Dep't of Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993)). Applying those principles to the case before it, the Fourth Circuit determined that "[w]ith respect to both the question of whether the EPA conducted an adequate search for records and the question of whether it justifiably has withheld [ ] documents, the district court seems to have placed the burden of proof on Ethyl, contrary to the terms of the FOIA." *Id.*

Several features distinguish this case from *Ethyl Corp.*, the most important of which is that this case is an APA action, not a FOIA action. In FOIA litigation, "it is the agency which has the burden of demonstrating, for each identifiable document, that the document fits into one of the exemptions," and exemptions are "construed narrowly in favor of disclosure." *Freeman v. U.S.*

12

*Dep't of Just.*, 723 F. Supp. 1115, 1119 (D. Md. 1988) (citations omitted). Most of the precedent Smith invokes come from the FOIA context. *See* ECF 37-1, at 7–9. In an APA challenge, however, "as part of the 'presumption of regularity' traditionally afforded to government officials carrying out their duties, 'when an agency certifies that the administrative record it has provided to the court is complete, courts generally presume it to be so absent clear evidence to the contrary.'" *CASA, Inc. v. Noem*, Civ. No. 25-1484-TDC, 2025 WL 3514378, at *8 (D. Md. Dec. 8, 2025) (quoting *Mestanek v. Jaddou*, 93 F.4th 164, 172 (4th Cir. 2024)).

Consequently, the Court concludes that Smith's request for *in-camera* review of the FBI's material designated as privileged is not warranted here. Smith has not provided any reason why the Court should suspect the memoranda are anything other than what the FBI has described. Moreover, the proper focus of the Court's inquiry in an APA case is on the agency's articulated reasons for the action it took, rather than its pre-decisional process. The administrative record as filed provides the Court with a clear picture of the FBI's reasoning for its decision in response to Smith's *Touhy* request. Relatedly, the Court declines Smith's request to require the FBI to produce its privilege log for judicial review. Generally, no privilege log is required for "internal emails, correspondence, summaries, and drafts" because those materials "are not properly part of the administrative record in the first place." *Outdoor Amusement*, 2017 WL 3189446, at *21 (quoting *Tafas*, 530 F. Supp. 2d at 801–02). That the FBI provided such a log to Smith, rather than to the Court, was sufficient.

### 2.   Email Communications

Smith also contends that the administrative record should be supplemented with "any and all emails and communications generated by the Defendant but not included" in the administrative record, "including but not limited to those sent within the Agency and those sent externally to the Office of the States Attorney for Anne Arundel County and local law enforcement in Anne Arundel

County." ECF 32, at 6. Like Smith's request for the unredacted copies of all documents in the administrative record, his ask here sweeps too broadly and lacks the requisite support.

To overcome the presumption of completeness in the administrative record, Smith needed to "identify reasonable, non-speculative grounds for the belief that the documents were considered by the agency and not included in the record" and identify those documents "with sufficient specificity, as opposed to merely proffering broad categories." *See Outdoor Amusement*, 2017 WL 3189446, at *13. Despite the requirement of specificity, the FBI's "emails" are the only documents mentioned, and they are only referenced in the conclusion and proposed order attached to Smith's motion to supplement the administrative record. *See* ECF 32, at 6; ECF 32-1, at 1. Smith does not point the Court towards any indication in the record that these emails even exist. *Cf. Mestanek*, 93 F.4th at 172 ("As for the other two 'missing' documents, it is not even clear that they exist. Nothing in the record refers to any notes taken by the FDNS investigators or even suggests that notes were taken, and the Mestaneks' speculation alone will not suffice."). Indeed, Smith acknowledges his limited ability to demonstrate "that there were communications between the federal government and state and local law enforcement that are not included in the administrative record." ECF 32, at 4. In the absence of any suggestion about what these emails or other communications contain, or what in this record indicates their existence, the presumption of completeness afforded to the agency remains intact.

Moreover, ordering the inclusion of agency communications in as broad a manner as Smith requests would almost certainly result in the inclusion of communications inappropriate for supplementation. First, any internal FBI email communications related to Smith's *Touhy* request are likely deliberative and pre-decisional materials not appropriate for inclusion in an administrative record. *See Outdoor Amusement*, 2017 WL 3189446, at *15 (determining that

14

several agency emails were quintessentially deliberative and unrelated to the relevant regulations);

*see also Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 313 (S.D.N.Y. 2012)

(holding that the non-inclusion of various pre-decisional materials, including "emails and other

documents," was justified); *Tafas*, 530 F. Supp. 2d at 801 (concluding that "internal emails,

correspondence, summaries, and drafts" plaintiff sought were "not properly part of the

administrative record in the first place"); *Ad Hoc Metals Coal. v. Whitman*, 227 F. Supp. 2d 134,

142–43 (D.D.C. 2002) (declining to supplement the record "with a number of internal EPA e-mails

exchanged throughout the [ ] rulemaking process"). Second, Smith's request indicates that he is

particularly interested in communications between the FBI and the AAC-SAO related to AAC-

SAO's *Touhy* request. However, the decision-making process and justifications provided by the

FBI regarding a separate *Touhy* request, even a related one, are not the proper subject of this

Court's consideration, and Smith does not have standing to challenge that distinct agency action.

Accordingly, Smith's motion to supplement the administrative record is denied.

### B.     Motions for Summary Judgment

The FBI and Smith both move for summary judgment in their favor. *See* ECF 33 (FBI);

ECF 37 (Smith). The parties focus on two issues: (1) whether the FBI's decision on Smith's *Touhy*

request ran afoul of Smith's constitutional rights under the Sixth Amendment in violation of

§ 706(2)(B) of the APA and (2) whether the FBI's decision was arbitrary and capricious in

violation of § 706(2)(A) of the APA. The Court addresses each issue in turn.

> 1.     The FBI has not violated Smith's rights under the Sixth Amendment and
> *Brady.*

"Section 706(2)(B) directs that the reviewing court set aside agency actions the court finds

to be 'contrary to constitutional right, power, privilege, or immunity.'" *Darden v. Peters*, 488 F.3d

277, 283 (4th Cir. 2007) (quoting 5 U.S.C. § 706(2)(B)). "Under the APA, constitutional questions

that arise during APA review fall expressly within the domain of the courts." *Id.* at 283–84. "Thus, judicial review of a claim that the agency's actions violated a claimant's constitutional rights is conducted *de novo.*" *Id.* at 284 (citing *Western Energy Co. v. United States Dep't of Interior*, 932 F.2d 807, 809 (9th Cir.1991)). Smith argues that the FBI's partial denial of his *Touhy* request was contrary to his constitutional rights under the Sixth Amendment as articulated in *Brady v. Maryland*, 373 U.S. 83 (1963). *See* ECF 1, at 10; ECF 37-1, at 12.

"The Supreme Court has always defined the *Brady* duty as one that rests with the prosecution." *Jean v. Collins*, 221 F.3d 656, 660 (4th Cir. 2000) (en banc) (Wilkinson, J., concurring, joined by Widener, Wilkins, Niemeyer, Williams, & Traxler, JJ.) (collecting cases). "Under *Brady*, 'suppression *by the prosecution* of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith *of the prosecution.*'" *United States v. Briscoe*, 101 F.4th 282, 297 (4th Cir. 2024) (emphasis added) (quoting *Brady*, 373 U.S. at 87).

The government's duty to disclose exculpatory and impeachment evidence "encompasses not only material that is in the possession of the prosecutor, but also material that is 'known to others acting on the government's behalf in the case, including the police.'" *Horton v. United States*, 983 F. Supp. 650, 654 (E.D. Va. 1997) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). "But there is no 'duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue.'" *Id.* (quoting *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996)). "The prosecutor's constructive knowledge of material evidence extends only to 'federal agenc[ies] participating in the same investigation of the defendant.'" *Id.* (alteration in *Horton*) (quoting *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989)). Here, the FBI participated in the State's investigation

16

of Smith's involvement in the Annapolis shooting, and it produced information related to its assistance with that investigation from the 343G Assist File. However, the FBI refuses to produce information from the separate and ongoing investigation into Ruiz, the 218C Investigation File.

As the FBI suggests, the Fourth Circuit's decision in *Kasi v. Angelone*, 300 F.3d 487 (4th Cir. 2002), is instructive. There, Kasi was convicted in state court of charges arising out of the shooting of CIA employees. *Id.* at 490. The FBI participated in the investigation of those crimes. *See id.* at 491. Prior to trial, the petitioner made a *Brady*-based *Touhy* request seeking from the FBI documents related to the investigation of the petitioner's crimes and his subsequent apprehension. *Id.* at 500. The FBI produced some of the documents requested and made an agent available for questioning by the defense, but refused to comply with the subpoenas *duces tecum.*[3] *Id.* at 501. Separate from his criminal case in state court, Kasi filed a FOIA action in federal district court to compel production by the DOJ and FBI, which argued information was properly withheld "under a FOIA exception for 'investigatory files compiled for law enforcement purposes whose release could reasonably be expected to interfere with enforcement proceedings.'" *Id.* at 507 (quoting *Kansi v. U.S. Dep't of Just.*, 11 F. Supp. 2d 42, 43–44 (D.D.C.1998)). The district court dismissed the FOIA case and Kasi did not appeal. *Id.*

However, through an appeal of a district court's denial of Kasi's later petition for a writ of habeas corpus, the Fourth Circuit heard Kasi's challenge to the Virginia Supreme Court's rejection of his "claim that his rights under *Brady* were violated by the trial court's refusal to enforce subpoenas issued to the FBI." *Id.* at 504. Kasi argued that his petition should have been granted

---

[3] "A subpoena *duces tecum* is a document that requires the person or entity served with it to provide requested documents or information in their possession." *Yates v. Dir. of Nursing HDSP*, No. 2:23-CV-02008-CDS-NJK, 2024 WL 3028337, at *4 (D. Nev. June 17, 2024) (italics added) (citing Fed. R. Civ. P. 45).

because "the Virginia Supreme Court's rejection of his *Brady* claim was contrary to or an unreasonable application of Supreme Court precedent because, under such precedent, the Commonwealth had a duty to review the FBI files for *Brady* material notwithstanding the sovereign immunity bar to the state trial court's enforcement authority.'" *Id.* The Fourth Circuit observed that *Brady* "created no general constitutional right to discovery in a criminal case," nor did it establish "a right to rummage through governmental files." *Id.* The court concluded that the petitioner "failed to establish a basis for his claim that the federal agency files contained material evidence." *Id.* at 505. Further, the Fourth Circuit rejected the petitioner's argument that he was "denied due process because . . . the Commonwealth was required to conduct a *Brady* review of the FBI's files in order to locate and produce any exculpatory evidence that *might* exist within them." *Id.* (emphasis in original). In sum, the Fourth Circuit effectively rejected a *Brady* challenge to the refusal to enforce a *Touhy* request even where the FBI refused to disclose material that came from the investigation of the petitioner's crimes and his apprehension.

To rebut the force of *Kasi*, Smith invokes *Johnson v. Reno*, 92 F. Supp. 2d 993, 995 (N.D. Cal. 2000), in which a district court compelled certain federal agencies to produce the requested materials pursuant to the APA and *Brady* to a plaintiff who was charged with "two counts of homicide with special circumstances, and for which the State of California [was] seeking the death penalty." *Id.* at 994. However, *Johnson* involved agencies that were "intimately involved in the investigation which led to Plaintiff's arrest." *Id.* The *Johnson* Court reasoned that "[b]y virtue of their participation in this investigation, these agencies may have in their possession information helpful to Plaintiff's defense." *Id.* Beyond that minimal context, however, the court in *Johnson*

18

offered little explanation as to the nature of the agencies' involvement in the investigation.[4]
Moreover, the *Johnson* Court assumed that the materials the plaintiff sought were "relevant
materials that would, in a federal criminal trial, be discoverable under *Brady*[]" as the materials
"contain information that is either exculpatory or relates to the credibility of witnesses in the case
against him." *Id.* at 995. The case at bar presents a difference scenario where the nature of the
materials sought is not so easily classified as *Brady* material. Moreover, the plaintiff in *Johnson*
also established that the requested materials related "directly to, and effect [the *Johnson* plaintiff's]
defense in the underlying criminal matter" and that the federal agencies at issue there had
"complied with information requests from the state prosecutor and law enforcement agencies and
yet refused to honor similar requests from [him] for relevant materials." *Id.* Here, the FBI has
declined to provide materials to *both* the AAC-SAO and Smith alike. Further, *Johnson* is readily
distinguishable because the materials Smith seeks from the FBI now do not document the FBI's
"intimate[] involve[ment] in the investigation *which led to Plaintiff's arrest*." *Id.* (emphasis
added). In fact, it appears uncontroverted that in providing materials from the 343G Assist File,
the FBI ensured that Smith received the precise documentation at issue in *Johnson*, namely
materials that relate *directly* to Smith's criminal investigation and prosecution.

In this case, the FBI complied with the *Touhy* request insofar as it related to the FBI's
involvement in the investigation of Smith and the crime at issue. What the FBI did not do,
however, was disclose material related to the ongoing investigation of one of Smith's victims, an
investigation which existed independent of Smith's alleged criminal acts and wholly separate from

---

[4] The bulk of the *Johnosn* opinion establishes the uncontroversial fact that an APA action in federal
court is "in fact the proper means for challenging a federal agency's refusal to produce information
to a criminal defendant in state court." *Johnson,* 92 F. Supp. 2d at 994 (citing *United States v.
Williams,* 170 F.3d 431, 434 (4th Cir.1999)).

the State's request for the FBI's assistance in investigating such acts. Smith argues that "[i]f State prosecutors and police can voluntarily enlist federal agencies to assist with its case, and those federal agencies can unilaterally withhold potentially exculpatory information while a man stands trial for his life, then *Brady* is effectively eviscerated." ECF 37-1, at 15. But Smith overlooks the fact that the FBI *did* provide information related to its assistance and involvement with the State's investigation into Smith and the shooting. And Smith points to no evidence on this record "that the FBI somehow used its status as a joint investigator to shield exculpatory information." *Cf. Rimmer v. Holder*, 700 F.3d 246, 259 (6th Cir. 2012). Accordingly, the Court concludes that the FBI did not violate any of Smith's Sixth Amendment rights in its partial denial of his *Touhy* request and, indeed, satisfied any obligations under *Brady* by disclosing information related to its investigation of Smith to both the AAC-SAO and Smith.

Furthermore, the Government is right to draw the Court's attention to the "utility of the information Smith seeks." ECF 33-1, at 18. Smith's *Touhy* request itself reflects that the information was requested in part because he was "claiming self-defense against violent gang members in this case." ECF 28-1, at 26. The existence of and information related to a "hit" on his life weeks after the shooting, however, has limited tendency to show whether Smith believed himself to be "in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant" at the time of the shooting. *See Porter v. State*, 166 A.3d 1044, 1053 (Md. 2017) (describing the requirement of subjective belief in such danger as a requirement of both perfect and imperfect self-defense under Maryland law). To be sure, the existence of a subsequent coordinated effort by the Mireles family to violently retaliate against Smith might bolster the validity of Smith's assertion that Ruiz associated with people who had a propensity for violence. It does little, however, to assist the jury in finding the key question of what was on

Smith's mind at the time of the mass shooting. Stated differently, the person whose "known propensity for violence" is relevant to Smith's self-defense argument is Ruiz. ECF 33-1, at 19. The requested information does not address Ruiz's propensity for violence and thus arguably falls outside the boundaries of *Brady* because of it.

### 2. The FBI's decision on Smith's *Touhy* request was not arbitrary and capricious under the APA.

To the extent a litigant seeks to challenge the government's refusal to comply with a subpoena, "such a challenge is both available and proper under the APA because sovereign immunity is waived as to federal agencies under the APA." *See Smith*, 766 F. Supp. 3d at 510 (quoting *COMSAT Corp.*, 190 F.3d at 574). As the Court previously noted, Smith is entitled to challenge the decision of the FBI to deny his *Touhy* request for information related to the 281C Investigation File under the APA. *See id.* at 511 (first citing *Williams*, 170 F.3d at 434; and then citing *COMSAT Corp.*, 190 F.3d at 274). And as discussed, the Court's review is confined to the administrative record. *See supra* Section III.A.

To reiterate, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines*, 371 U.S. at 168. "In reviewing that explanation, we must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974)). The Court "may not supply a reasoned basis for the agency's action that the agency itself has not given," but the Court will "uphold a decision of less

than ideal clarity if the agency's path may reasonably be discerned." *Id.* (quoting *Bowman*, 419
U.S. at 286). For the reasons to follow, the Court is satisfied the FBI's partial denial of Smith's
*Touhy* request had a reasoned basis and thus was not arbitrary and capricious in violation of the
APA.

Smith requested two types of information from the FBI. *See* ECF 28-1, at 26. First, Smith
requested "[a]ny and all information regarding the hit put out by the Mireles family and their
associates on Charles Robert Smith," which Smith claimed to have knowledge of based on "a call
from a special agent (unnamed)" to another investigator on or about June 23, 2023, in the aftermath
of the shooting, "stating that a reliable source had provided information to him/her that the Mireles
family and its associates were collecting money to finance a hit" on Smith. *Id.* Second, Smith
requested "[a]ny and all information regarding the association, participation and/or membership"
of Ruiz, among other members of the Mireles family and their alleged associates, "in MS-13, any
Mexican cartel, and/or any criminal organizations known to operate within MS-13 and any
Mexican cartel." *Id.* Smith's request explained that he believed the information to be "*Brady*
material insofar as it may serve, whether or not admissible, to exculpate [ ] Smith or negate or
mitigate [ ] Smith's guilt or punishment as to some or all of the offenses charged" because "Smith
is claiming self-defense against violent gang members in this case." *Id.*

In response to Smith's request, the FBI sent a letter explaining that, subject to certain terms
and conditions "the requested disclosure of the FBI's documents from FBI #343G-BA-3773068
has been authorized" but that the "production of materials, documents, or information from FBI
#281C-BA-3708548" and the testimony of related special agents were not authorized. ECF 28-1,
at 49. The letter explained that the authorization did "not extend to any information or documents
that may compromise any ongoing federal criminal investigation" nor "the identity of or

information indicating the identity of confidential sources or informants." *Id.* It also described

that "investigative techniques, target names, informant names, witnesses, [and] defendants,"

among other things, were not included, nor any privileged information, including disclosures

related to the "internal deliberation process" of the FBI, "information that would threaten or

endanger the lives or safety of any individual," and disclosures "that could interfere with ongoing

criminal investigations or prosecutions, or reveal investigative or intelligence gathering and

dissemination techniques, the effectiveness of which would thereby be impaired." *Id.* at 49–50.

Smith's defense attorney sent a follow up letter indicating that she did not believe the

information produced was responsive to the *Touhy* request because the materials provided were

"related to the FBI, ATF and Annapolis Police Department investigation of the June 11, 2023

shooting that is the subject of this case" rather than specific information related to Ruiz's

involvement in potential criminal drug activity and the alleged hit put out on Smith. ECF 28-1, at

51. The FBI responded with another letter, reiterating that "the Department of Justice has denied

your *Touhy* request because of the concerns that disclosing such information may compromise an

ongoing criminal investigation or disclose the identity of confidential source(s)." *Id.* at 53.

Smith argues that "[t]he FBI failed to consider the relevance of the sought after information

to [ ] Smith's defense and it failed to substantially articulate the reason for the denial." ECF 37-1,

at 11.[5]  However, the FBI's letter articulating its rationale, in addition to its follow-up letter,

identify a reasoned basis for its decision on the *Touhy* request. First, with respect to information

existing on Ruiz and other Mireles family members or associates, the FBI stated that it could not

---

[5] The Court observes that the majority of Smith's memorandum in support of his cross-motion for summary judgment and in opposition to the FBI's motion focuses on advancing a Sixth Amendment constitutional challenge pursuant to 5 U.S.C. § 706(2)(B), ECF 37-1, at 12-19, rather than an arbitrary and capricious challenge under § 706(2)(A), *id.* at 9-12.

authorize disclosure of any existing information that interfered or threatened an ongoing criminal investigation, among other reasons. *See* ECF 28-1, at 49, 53. The governing regulation provides that disclosure will not be made where certain factors exist, including where "[d]isclosure would reveal investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired." 28 C.F.R. § 16.26(b)(5). Because the FBI's investigation into Ruiz and his alleged criminal drug activity were and remain ongoing, the FBI was obligated to prohibit disclosure of information that would interfere with that investigation. Nevertheless, the FBI produced four redacted reports from the 281C Investigation File that predated Ruiz's death containing responsive information regarding Ruiz's alleged involvement in criminal drug activity.[6] ECF 28-1, at 12–23. These documents include reference to the fact that in "August 2022, investigators began to receive information" that Ruiz was "selling cocaine in and around Annapolis." *Id.* at 13. In addition, the documents reflect that Ruiz was "often seen with a variety of handguns and long guns." *Id.* The FBI's conclusion that Ruiz's death permitted the release of

---

[6] The FBI made these productions in response to the AAC-SAO's prior *Touhy* request, which specified that its request was made with the purpose of disclosing information to Smith for use in his defense pursuant to Maryland Rule 4-263(d)(5). *See* ECF 28-1, at 6. "[B]ecause the FBI and USAO had already undertaken a review of the 281C Investigation file for materials relating to gang affiliations for Ruiz, the FBI refused to indulge Smith's request to do so again." ECF 33-1, at 17. Smith received this information through the AAC-SAO's disclosure, and he does not appear to take issue with the channel through which the disclosure occurred. *See, e.g.*, ECF 37-1 ("The defense submitted a Touhy request seeking records and communications between the FBI and local law enforcement concerning threats to Mr. Smith's life, including the cartel-ordered hit and any gang affiliations of the victims. In response, the FBI produced only a handful of documents, comprising five sentences of substance, with multiple pages left entirely blank and presumably entire reports left out of the disclosure. A.R 8-19."). Put differently, Smith's challenge focuses on what information was *not* disclosed, rather than the means of disclosure for the information that was provided.

24

this limited information as it no longer compromised an ongoing drug investigation reflects a reasoned decision, consistent with the FBI's obligations under the Code of Federal Regulations.

Second, the FBI's response to Smith's request for information related to any "hit" put on his life while he was in jail by the Mireles family also had a reasoned basis. 28 C.F.R. § 16.26 prohibits disclosures that would "reveal a confidential source or informant, unless the investigative agency and the source or informant have no objection." 28 C.F.R. § 16.26(b)(4). As Smith's request itself reflected, the information about the alleged "hit" came from an unnamed "reliable source." *See* ECF 28-1, at 26; *see also id.* at 34 (email from FBI Special Agent noting that "a reliable source . . . said the Mireles family and associates are getting money together to put a hit out on Charles Smith in jail"); *id.* at 35 (FBI record reflecting that an "FBI Confidential Human Source" provided information about the alleged "hit" on Smith). The administrative record thus supports a "rational connection between the facts found and the choice made" by the FBI to withhold additional information about the hit, as whatever additional information even existed implicated the identity of a confidential informant. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).

The FBI's decision regarding Smith's *Touhy* request would be "arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *RLI Ins. Co. v. Nexus Servs., Inc.*, No. 5:18-CV-00066, 2020 WL 1496466, at *2 (W.D. Va. Jan. 17, 2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43). To the contrary, the administrative record here establishes that the FBI made its denial in accordance with the applicable *Touhy* regulations and articulated reasons

in two responsive letters that support a finding that it considered the request in the manner required by law. Accordingly, this Court must defer to the agency's reasoned judgment, in recognition that "federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do." *In re Subpoena to Nat'l Sci. Found.*, 2018 WL 5017612, at *2 (quoting *COMSAT Corp.*, 190 F.3d at 278). The Court therefore concludes that the FBI's decision on Smith's *Touhy* request did not violate the APA.

## IV.    CONCLUSION

For the foregoing reasons, Smith's motion to supplement, ECF 31, is denied, the FBI's motion for summary judgment, ECF 33, is granted, and Smith's cross-motion for summary judgment, ECF 37, is denied.

A separate implementing order will issue.

Dated: <u>January 13, 2026</u>                              <u>        /s/        </u>
                                                                          Brendan A. Hurson
                                                                          United States District Judge